E-FILED
Thursday, 09 May, 2019  02:56:32 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| RYAN HUBERT, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| FORD MOTOR COMPANY, | |
| Defendant. | |

## CLASS ACTION COMPLAINT

Plaintiff Ryan Hubert, individually and on behalf of the other members of the below-defined nationwide and statewide classes he seeks to represent (collectively, the "Class"), by and through his undersigned attorneys, hereby alleges against Defendant Ford Motor Company ("Defendant" or "Ford") as follows:

## INTRODUCTION

1.     This is a class action lawsuit brought by Plaintiff Ryan Hubert on behalf of himself and a class of current and former owners or lessees of model year 2017 through 2019 Ford automobiles that were marketed and sold with false fuel-

1

economy ratings. Such vehicles include the 2019 Ford Ranger and the 2018 Ford F-150 (collectively "Class Vehicles").[1]

2.     Ford represented to customers their vehicles had achieved specific MPG estimates. Ford, however, concealed that it conducted inadequate and inaccurate EPA fuel economy testing, resulting in Class Vehicles with overstated miles-per gallon EPA fuel economy ratings.

3.     Ford's EPA fuel economy ratings and advertising statements overstated by a material amount the actual numbers that the required testing would have produced. These misstatements are material because the EPA numbers provide a necessary tool for vehicle comparison for consumers when evaluating vehicles to lease or purchase, and they exist to help foster realistic numbers with which consumers can compare one of the most important factors in new-car buyers' purchase decisions.

4.     The use of EPA's testing methods is required by federal law, but Ford's testing methods were flawed and insufficient. They produced inaccurate fuel economy ratings that did not comply with federal regulations. Ford itself admits that its U.S. emissions certification process is a cause for concern.

---

[1] Plaintiff reserves the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

5.      Ford knew or should have known facts indicating the inaccuracies in the promised gas mileages of its vehicles. Ford consciously or recklessly disregarded facts that indicated the fuel economy ratings were erroneous and overstated.

6.      Since at least September of 2018 Ford has been aware of concerns pertaining to gas mileage inaccuracies through Ford's "Speak Up" employee reporting channel. Furthermore, standard internal testing and investigation should have revealed the problem.

7.      Ford willfully and uniformly failed to identify and correct its misstatements. Ford's failure to disclose the defects in its fuel economy testing constitutes an actionable misrepresentation, an unfair, unlawful, fraudulent, and deceptive business practice in violation of consumer protection laws of various States, and a breach of the express warranties offered by Ford. Additionally, Ford's failure to comply with federal law violates the unfair competition law.

8.      This action seeks relief for the injuries sustained as the result of the inaccurate testing methods used by Ford to ascertain the fuel economy ratings of its vehicles and material misstatements regarding those ratings used in the marketing and sales of certain 2017-2019 Ford vehicles in the United States.

9.      Plaintiff and the other Class members have been damaged by Ford's misrepresentations, concealment, and non-disclosure of the incorrect fuel economy numbers, because they were misled into purchasing Ford vehicles of a quality

different than they were promised and paying more for their Class Vehicles than they otherwise would have, and by paying higher fuel costs that they would otherwise have not paid.

## JURISDICTION AND VENUE

10.    This Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff and other putative class members are citizens of a different state than Defendant.

11.    This Court has personal jurisdiction over Plaintiff because he is a United States citizen and resides within this judicial district. This Court has personal jurisdiction over Ford, because it conducted and continues to conduct substantial business in the District and because it has committed the acts and omissions complained of herein in the District, including the marketing and leasing of the Class Vehicles in this District.

12.    Venue as to Defendant is proper in this judicial district under 28 U.S.C § 1391 because Defendant sells a substantial number of automobiles in this District, has dealerships in this District, and many of Defendant's acts complained of herein occurred within this District, including the marketing and leasing of the Class Vehicles to Plaintiff and members of the putative Class in this district.

## PARTIES

4

13.    Plaintiff Ryan Hubert is a citizen of the State of Illinois, and currently resides in Champaign, Illinois.

14.    In or about February of 2019, Plaintiff purchased a new 2018 Ford F-150 XL from Heller Ford, an authorized Ford dealership, located in El Paso, Illinois for personal, family, and/or household use.

15.    Prior to purchasing his Class Vehicle, Plaintiff test drove the vehicle, viewed advertisements for the vehicle and the vehicle's window sticker, and spoke with Ford sales representatives concerning the vehicle's features. Neither Ford nor its agents, dealers, or other representatives informed Plaintiff of the true fuel economy rating of the vehicle at any time either prior to or following his purchase, whether at the point of sale or otherwise. Plaintiff relied on Defendant's misrepresentations and omissions in deciding to purchase his vehicle.

16.    Specifically, the window sticker stated that the Class Vehicle's miles per gallon ratings were: 24 highway, 19 city, and 21 combined. The window sticker also stated that the vehicle was covered by Ford's New Vehicle Limited Warranty. Plaintiff relied on these representations when deciding to purchase his vehicle.

17.    Plaintiff has suffered an ascertainable loss as a result of Ford's omissions and/or misrepresentations above, including but not limited to the diminished value of his Class Vehicle. Had Ford disclosed the true fuel economy

ratings to Plaintiff, he would not have bought his Class Vehicle or would have paid less for it.

18.     Defendant Ford Motor Company is a Delaware corporation with its principal place of business at One American Road in Dearborn, Michigan.

19.     At all times relevant herein, Defendant Ford engaged in the business of designing, manufacturing, marketing, warranting, distributing, selling, and leasing automobiles, including the Class Vehicles, throughout the United States.

## FACTUAL ALLEGATIONS

### A. The EPA Requires Specific Fuel Economy Testing Methods

20.     Under regulations issued by the United States Environmental Protection Agency ("EPA"), every new car and truck or SUV up to 10,000 pounds sold in the United States (the "New Vehicles") must have a fuel economy label or window sticker that contains the vehicle's miles-per-gallon ("MPG") estimates. The fuel economy ratings have been given to consumers since the 1970s and are posted for the customers' benefit to help them make valid comparisons between vehicles' MPGs when shopping for a new vehicle.

21.     The EPA's standardized test procedures are "designed to create a level playing field for all vehicles," such that consumers can rely on these values when determining which vehicles are more fuel efficient. Fuel economy is measured under controlled conditions in a laboratory using a series of tests specified by federal law.

6

22.     Manufacturers test their own vehicles and report the results to EPA. Manufacturers do not test every new vehicle offered for sale. They are only required to test one representative vehicle—typically a preproduction prototype—for each combination of loaded vehicle weight class, transmission class, and basic engine.[2]

23.     Ford utilizes "road load" tests to calculate fuel economy ratings that are ultimately submitted to the EPA. According to Ford, "Road load is a vehicle-specific resistance level used in vehicle dynamometer testing, including for fuel economy ratings and emissions certifications. Road load is established through engineering models that are validated through vehicle testing, including physical track tests referred to as coastdown testing."[3]

24.     Coastdown testing simulates aerodynamic drag, tire rolling resistance, and drivetrain frictional losses and provides the technical data used to program the test dynamometers that generate EPA fuel economy ratings. In a coastdown test, a vehicle is brought to a high speed on a flat, straight road and then set coasting in neutral until it slows to a low speed. By recording the time the vehicle takes to slow down, it is possible to model the forces affecting the vehicle.

---

[2] https://www.fueleconomy.gov/feg/which_tested.shtml (last accessed May 9, 2019).

[3] https://media.ford.com/content/fordmedia/fna/us/en/news/2019/02/21/ford-investigating-process-for-us-emissions-certification-conc.html (last accessed May 9, 2019).

25.     Coastdown tests are governed by tests developed by The Society of Automotive 20 Engineers ("SAE"). Data variability and error can be controlled, but several factors must be considered under the SAE standards, including calculation of the mass of the vehicle, tire pressure, weather and environmental factors (*e.g.*, wind speed, air temperature, humidity, and barometric pressure), aerodynamic factors, road surface, experiment design and methodology, measurement errors and data acquisition systems, and vehicle qualifications.

26.     The EPA reviews manufacturer test results and confirms about 15–20% of them through their own tests at the National Vehicles and Fuel Emissions Laboratory.[4] Some vehicle models are selected for testing because of consumer complaints while others are selected at random. Historically, the EPA has audited between 10% and 15% of new vehicle models (or about 150-200 vehicles), but this has grown to 15-20% in recent years.[5]

**B. Ford Touts the Fuel Efficiency of Class Vehicles**

---

[4] Specifically, the EPA tests vehicles by running them through a series of driving routines, also called *cycles* or *schedules*. These test cycles represent a variety of driving conditions including speed, acceleration, braking, air conditioning use, and ambient temperatures. The test results from the driving cycles are combined to yield individual "city" and "highway" values, and a "combined" fuel economy value that assumes a 55% city/45% highway split. https://nepis.epa.gov/Exe/ZyPDF.cgi/P100IENB.PDF?Dockey=P100IENB.PDF (last accessed May 9, 2019).

[5] *Id.*

27.   Ford, knowing the importance of fuel economy to consumers, deliberately advertised the Class Vehicles as fuel efficient.

28.   For example, Ford touted the 2019 Ranger as the "most fuel-efficient gas-powered midsize pickup in America."[6] Ford represented the 2019 Ford Ranger as "providing a superior EPA-estimated city fuel economy rating and an unsurpassed EPA-estimated combined fuel economy rating versus the competition."[7] Specifically, Ford represented that the 2019 Ranger as having "earned" EPA-estimated fuel economy ratings of "21 mpg city, 26 mpg highway and 23 mpg combined" when configured as a 4x2 truck, and EPA-estimated fuel economy ratings of "20 mpg highway, 24 mpg highway, and 22 mpg combined" when configured as a 4x4 truck.[8] These fuel economy ratings were also advertised on the vehicle's window sticker.[9]

---

[6] http://www.campaign.ford.com/content/fordmedia/fna/us/en/news/2018/12/11/ford-ranger-rated-most-fuel-efficient-gas-powered-midsize-pickup.html (last accessed May 9, 2019).

[7] *Id.*

[8] *Id.*

[9] https://www.slashgear.com/2019-ford-ranger-fuel-economy-confirmed-via-an-online-window-sticker-26555140/#jp-carousel-555142 (last accessed May 9, 2019).

29.     The fuel economy of the 2019 Ford Ranger advertised by Ford has not been consistent with reports by independent third parties and consumers. For example, after taking the 2019 Ford Ranger on a 1,000 mile road trip, one automobile writer reported an average of 19.5 miles per gallon while on the highway— significantly less than the 24 mpg advertised by Ford.[10] The discrepancy between the fuel economy numbers promulgated by Ford and those reported by consumers will likely cost consumers thousands of dollars more in fuel costs over the life of Class Vehicles and result in increased vehicle pollution—neither of which was bargained for by consumers at the time of purchase.

30.     Ford knew or reasonably should have known that its representations to both the public and the EPA pertaining to the fuel economy would be a major consideration that consumers would rely upon when deciding to purchase or lease a Class Vehicle.

### C. Ford Reveals Concerns with its Fuel Economy Calculations

31.     In its annual report filed with the SEC on February 21, 2019, Ford indicated that "[t]he Company has become aware of a potential concern involving

---

[10] https://www.tfltruck.com/2019/02/real-world-2019-ford-ranger-fuel-economy-here-is-the-unexpected-result-after-a-1000-mile-road-trip-video/ (last accessed May 9, 2019).

its U.S. emissions certification process" and that the Company "cannot provide assurance that it will not have a material adverse effect on [Ford]."

32.     That same day, Ford published a press release revealing that Ford knew about the concern with the analytical modeling part of its U.S. fuel economy and emissions compliance process as far back as September 2018, when employees alerted Ford through its "Speak Up" employee reporting channel.[11]

33.     At this time, Ford indicated that it was hiring an outside firm to conduct an investigation into the vehicle road load specifications used in Ford's emissions and fuel economy testing and was also evaluating potential changes to its road-load modeling process.[12] In particular, Ford indicated that the 2019 Ranger was potentially affected and the company was also "assessing additional vehicles as well."[13] The relevant time period affecting Class Vehicles goes back to, at the very least, 2017.[14]

---

[11] https://media.ford.com/content/fordmedia/fna/us/en/news/2019/02/21/ford-investigating-process-for-us-emissions-certification-conc.html (last accessed May 9, 2019).

[12] *Id.*

[13] *Id.*

[14] https://www.freep.com/story/money/cars/2019/02/21/ford-stock-drops-amid-news-gas-mileage-inquiry/2944609002/ (last accessed May 9, 2019).

34.    Ford indicated at this time that the company had shared its concerns with both the Environmental Protection Agency and the California Air Resources Board ("CARB"). On February 18, 2019 Ford disclosed the concern with its emissions certification process with the EPA. However, a spokesman for CARB revealed that "as of [February 21], CARB has not received notification of the mileage issue from Ford."[15] Early the next day, Steve Cliff, deputy executive officer of CARB, told the Detroit Free Press that "[w]e learned of the apparent concerns with Ford's emissions certification through reports in the press."[16]

35.    Ford's history of promulgating false fuel economy data is not new: in 2014, Ford had to downgrade the fuel economy ratings for six of its vehicles, by 1 to 7 mpg, making payments to the roughly 200,000 car owners affected. (*See In re Ford Fusion & C-Max Fuel Econ. Litig.,* No. 13-MD-2450 (S.D.N.Y.).)

36.    Ford knew or reasonably should have known that its testing methodology might yield materially inaccurate fuel economy ratings. At the time Ford compensated affected vehicle owners in 2014, Alan R. Mulally, Ford's chief

---

[15] *Id.*

[16] *Id.*

executive, said in a statement that "[w]e are also taking steps to improve our processes and prevent issues like this from happening again."[17]

37.    Notwithstanding the fact that Ford was on notice about the impropriety of its testing methodology since at least 2014, Ford has *again* promulgated materially false fuel economy data. Ford's recent disclosure of its concerns demonstrates an intentional or otherwise reckless disregard for ensuring that its testing methodology is proper.

38.    The methods implemented by Ford to test fuel economy were not in accordance with EPA's requirements and were insufficient in design, procedure, content, execution, and/or completeness.

### D. Ford had Superior Knowledge of the Inaccurate Fuel Economy Testing

39.    At all times, Ford possessed vastly superior information to that of consumers. Ford knew of concerns associated with its fuel economy testing and corresponding increase in MPG ratings since at least September 2018—approximately five months *before* Ford chose to disclose its concerns to the public, the EPA, and California regulators. This information was uniquely within Ford's

---

[17] https://www.nytimes.com/2014/06/13/business/ford-lowers-fuel-economy-ratings-on-some-of-its-cars.html (last accessed May 9, 2019).

possession and, given its proprietary nature, was not easily discoverable by consumers.

40. Notwithstanding Ford's awareness of concerns with its fuel economy testing, Ford willingly disseminated false information to consumers through, at the very least, advertisements and the Class Vehicles' window stickers.

41. Ford knew, or reasonably should have known, that consumers would rely upon the information disseminated through advertisements and window stickers to compare material vehicle qualities to help make informed choices about the cars they buy.

42. Ford failed to disclose that the fuel economy information relied upon by consumers was materially false at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continued to sell Class Vehicles. Ford intentionally concealed concerns associated with its fuel economy testing and failed to provide any notice to consumers until February 21, 2019—well after Ford had or should have had notice that its fuel economy ratings were not trustworthy or accurate.

43. Although Ford knew the fuel economy data of Class Vehicles was not trustworthy or accurate it intentionally or otherwise recklessly misrepresented this data as such to the EPA, CARB, and consumers.

## CLASS ACTION ALLEGATIONS

44.     Plaintiff brings this action as a class action pursuant to Federal Rule of

Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following Classes:

> **The Nationwide Class**
> All persons or entities who purchased or leased a Class
> Vehicle in the United States
>
> **The Illinois Class**
> All persons or entities who purchased or leased a Class
> Vehicle in Illinois.

45.     Excluded from the Class are Defendant, its affiliates, employees,

officers and directors, persons or entities that purchased the Class Vehicles for

resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify,

change, or expand the Class definition.

46.     Certification of Plaintiff's claims for class-wide treatment is

appropriate because Plaintiff can prove the elements of his claims on a class-wide

basis using the same evidence as would be used to prove those elements in individual

actions alleging the same claim.

47.     This action has been brought and may be properly maintained on behalf

of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

48.     **Numerosity of the Class (Federal Rule of Civil Procedure**

**23(a)(1))** – The members of the Classes are so numerous that their individual joinder

is impracticable. Plaintiff is informed and believes that at least tens of thousands of

Class Vehicles were sold. Inasmuch as the class members may be identified through

15

business records regularly maintained by Defendant and its employees and agents, and through the media, the number and identities of class members can be ascertained. Members of the Classes can be notified of the pending action by e-mail, mail, and supplemented by published notice, if necessary.

49.     **Commonality and Predominance (Federal Rule of Civil Procedure 23(a)(2))** – There are questions of law and fact common to the Classes. These questions predominate over any questions affecting only individual class members. These common legal and factual issues include, but are not limited to:

    a.   Whether Defendant engaged in the conduct alleged herein;

    b.   Whether Defendant designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

    c.   Whether Defendant designed, manufactured, marketed, distributed, leased, sold or otherwise placed Class Vehicles into the stream of commerce in the United States when it knew, or should have known, that the fuel-economy ratings of the Class Vehicles were false;

    d.   When Defendant first learned of the false fuel-economy ratings of the Class Vehicles;

    e.   Whether Defendant intentionally concealed from consumers the true fuel-economy ratings of the Class Vehicles;

16

f.  Whether Defendant intentionally concealed from consumers that its fuel economy ratings were not accurate or trustworthy;

g.  Whether Plaintiff and the other Class members have been harmed by the fraud alleged herein;

h.  Whether Defendant was negligent in misrepresenting the fuel-economy ratings of the Class Vehicles;

i.  Whether Defendant was unjustly enriched by its deceptive practices;

j.  Whether Plaintiff and the other members of the Classes are entitled to equitable relief in the form of rescission of the purchase agreement or other injunctive relief and, if so, in what amount.

50.  **Typicality (Federal Rule of Civil Procedure 23(a)(3))** – The claims of the representative Plaintiff are typical of the claims of each member of the Classes. Plaintiff, like all other members of the Classes, has sustained damages arising from Defendant's conduct as alleged herein. The representative Plaintiff and the other members of the Classes were and are similarly or identically harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Defendant.

51.  **Adequacy (Federal Rule of Civil Procedure 23(a)(4))** – The representative Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes and he has retained counsel who are experienced

and competent trial lawyers in complex litigation and class action litigation. There are no material conflicts between the claims of the representative Plaintiff and the other members of the Classes that would make class certification inappropriate. Counsel for the Classes will vigorously assert the claims of all members of the Classes.

52.  **Superiority (Federal Rule of Civil Procedure 23(b)(3))** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), because questions of law and fact common to the Classes predominate over the questions affecting only individual members of the Classes and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct. Further, it would be virtually impossible for the members of the Classes to individually redress effectively the wrongs done to them. Even if members of the Classes themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims

which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

53.     The representative Plaintiff contemplates the eventual issuance of notice to the proposed Class members setting forth the subject and nature of the instant action. Upon information and belief, Defendant's own business records and electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, the representative Plaintiff would contemplate the use of additional media and/or mailings.

### COUNT I
### Violations of the Magnuson-Moss Warranty Act
### (On Behalf of the Nationwide Class)

54.     Plaintiff incorporates and re-alleges paragraphs 1-53 as though fully set forth herein.

55.     Plaintiff brings this Count individually and on behalf of the members of the Nationwide Class (the "Class," for purposes of this Count).

56.     This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a) and (d).

57.     Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

58.     Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

59.     The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

60.     15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

61.     As more fully described above, in selling the Class Vehicles, Defendant expressly warranted in advertisements that the Class Vehicles experienced fuel-economy efficiency.

62.     These express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

63.     With respect to Plaintiff's and the other Class members' purchases or leases of the Class Vehicles, the terms of Ford's express and implied warranties became part of the basis of the bargain between the parties.

64.     Ford breached these warranties as described in more detail above. Without limitation, the Class Vehicles experience less mpg than represented by Ford to their customers, the public, and regulators.

65.     Plaintiff and the other members of the Class have had sufficient direct dealings with Ford or their agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between the Ford or their dealers, and of their implied warranties. The dealers were not intended to be the ultimate users of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers only.

66.     Affording Ford a reasonable opportunity to cure their breach of written warranties would be unnecessary and futile. At the time of sale or lease of each Class Vehicle, Ford knew or should have known of the misrepresentations concerning the Class Vehicles' fuel economy ratings, but nonetheless failed to rectify the misrepresentation. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate, and any requirement that Plaintiff or the other Class members resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thus deemed satisfied.

67.     As a direct and proximate result of Ford's breaches of its Limited Warranty and the implied warranty of merchantability, Plaintiff and the members of

the proposed Classes and Subclasses have sustained damages in an amount to be determined at trial.

68.     The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

69.     Plaintiff, individually and on behalf of the Nationwide Class, seeks all damages permitted by law, including diminution in the value of their vehicles, in an amount to be proven at trial.

**COUNT II**
**Violation Of Illinois' Consumer Fraud and Deceptive Business Practices Act**
**(On Behalf of the Illinois Class)**

70.     Plaintiff incorporates and re-alleges paragraphs 1-53 as though fully set forth herein.

71.     Plaintiff brings this Count individually and on behalf of the members of the Illinois Class (the "Class," for purposes of this Count).

72.     Illinois's Consumer Fraud and Deceptive Business Practices Act prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce, including among others, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, … whether any person has in fact been misled,

22

deceived, or damaged thereby." 815 Ill. Comp. Stat. § 505/2. The Act also prohibits suppliers from representing that their goods are of a particular quality or grade that they are not.

73.     The Class Vehicles are "merchandise" as defined in 815 Ill. Comp. Stat. § 505/1(b). Ford is a "person" as defined in 815 Ill. Comp. Stat. § 505/1(c). Plaintiff and the other Illinois Class members are "consumers" as defined in 815 Ill. Comp. Stat. § 505/1(e).

74.     Ford has engaged in deception, fraud, unfair practices, and concealment by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff and the other Class Members the true fuel economy ratings of the Class Vehicles (and the costs and diminished value of the Class Vehicles as a result of Ford's conduct). Accordingly, Ford engaged in unfair or deceptive acts or practices as defined in 815 Ill. Comp. Stat. § 505/2, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

75.     The facts concealed or not disclosed by Ford to Plaintiff and the Illinois Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the Class Vehicles or pay a

lesser price. Had Plaintiff and the Illinois Class Members known about the true fuel economy ratings of the Class Vehicles, they would not have purchased the Class Vehicles or would have paid less for them.

76.    Plaintiff and the other Class members were injured as a result of Ford's conduct in that Plaintiff and the other Class members purchased Class Vehicles with materially less miles per gallon ratings than advertised, overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Ford's misrepresentations and omissions

77.    The injuries suffered by Plaintiff and the Class Members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff and the Class Members should have reasonably avoided.

78.    Plaintiff's and the other Class Members' injuries were proximately caused by Defendant's fraudulent and deceptive business practices.

79.    Ford's conduct in this regard was wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiff and the other Class members and, as such, warrants the imposition of punitive damages.

## COUNT III
### Fraud by Omission
### (On Behalf of the Illinois Class)

80.     Plaintiff incorporates and re-alleges paragraphs 1-53 as though fully set forth herein.

81.     Plaintiff brings this Count individually and on behalf of the members of the Illinois Class (the "Class," for purposes of this Count).

82.     The nondisclosure and/or concealment of material facts made by Defendant to Plaintiff and the other members of the Class, as set forth above, were known, or through reasonable care should have been known, by Defendant to be false and material and were intended to mislead Plaintiff and the other members of the Class.

83.     Plaintiff and the other Class members were actually misled and deceived and were induced by Defendant to purchase the Class Vehicles which they would not otherwise have purchased, or would have paid substantially less for.

84.     As a result of the conduct of Defendant, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT IV
### Unjust Enrichment
### (On Behalf of the Illinois Class)

85.     Plaintiff incorporates and re-alleges paragraphs 1-53 as though fully set forth herein.

25

86.     Plaintiff brings this Count individually and on behalf of the members of the Illinois Class (the "Class," for purposes of this Count).

87.     Because of its wrongful acts and omissions, Defendant charged a higher price for the Class Vehicles than the Class Vehicles' true value and Defendant obtained money which rightfully belongs to Plaintiff and the other members of the Class.

88.     Plaintiff and members of the Class conferred a benefit on Defendant by purchasing or leasing the Class Vehicles.

89.     Defendant had knowledge that this benefit was conferred upon them.

90.     Defendant has been unjustly enriched at the expense of Plaintiff, and its retention of this benefit under the circumstances would be inequitable.

91.     Plaintiff seeks an order requiring Defendant to make restitution to him and the other members of the Class.

**COUNT VIII**
**Breach of Implied Warranty**
**(On Behalf of the Illinois Class)**

92.     Plaintiff incorporates and re-alleges paragraphs 1-53 as though fully set forth herein.

93.     Plaintiff brings this Count individually and on behalf of the members of the Illinois Class (the "Class," for purposes of this Count).

94.     Ford is and was at all relevant times a "merchant, "seller," and "lessor" with respect to motor vehicles.

95.     The Class Vehicles are and were at all relevant times "goods."

96.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

97.     These Class Vehicles, when sold or leased and at all times thereafter, did not conform to the promise or affirmations of fact made by Ford. Specifically, as described above, the Class Vehicles' fuel-economy ratings did not conform to the fuel-economy representations made by Ford.

98.     As a direct and proximate result of Defendant's breach of implied warranties, Plaintiff and the other members of the Class have been damaged in an amount to be determined at trial.

**COUNT IX**
**Breach of Express Warranty**
**(On Behalf of the Illinois Class)**

99.     Plaintiff incorporates and re-alleges paragraphs 1-53 as though fully set forth herein.

100.   Plaintiff brings this Count individually and on behalf of the members of the Illinois Class (the "Class," for purposes of this Count).

101.   As more fully described above, in selling the Class Vehicles, Defendant expressly warranted in advertisements that the Class Vehicles experienced a certain fuel-economy efficiency.

102.   These affirmations and promises were part of the basis of the bargain between the parties.

103.   Defendants breached these express warranties arising from their advertisements because the fuel economy ratings for their vehicles were false.

104.   As a direct and proximate result of Defendant's breach of express warranties, Plaintiff and members of the Class have been damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.      For an order certifying this action as a class action;

2.      For an order appointing Plaintiff as the representative of the Classes and his counsel of record as Class counsel;

3.      For an award of actual, general, special, incidental, statutory, compensatory and consequential damages on claims as allowable and in an amount to be proven at trial;

4.      For an award of exemplary and punitive damages in an amount to be proven at trial;

5.    For attorneys' fees and costs;

6.    For an order enjoining the wrongful conduct alleged herein;

7.    For interest;

8.    For all such equitable relief and remedies as the Court deems just and appropriate, including but not limited to, rescission; restitution; and unjust enrichment;

9.    For injunctive relief ordering Ford to immediately cease fuel economy testing according to its flawed methodology;

10.   For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

Dated: May 9, 2019                    Respectfully submitted,

*/s/ Joel E. Brown*
Joel E. Brown
416 Main Street, Suite 1300
Peoria, Illinois  61602
Telephone:  309-673-4357
jb@joelebrown.com

Adam J. Levitt
John E. Tangren
Adam Prom
**DICELLO LEVITT GUTZLER LLC**
Ten North Dearborn Street, Eleventh Floor
Chicago, Illinois  60602
Telephone:  312-214-7900
alevitt@dicellolevitt.com
jtangren@dicellolevitt.com
aprom@dicellolevitt.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
William Kalas (P82113)
**THE MILLER LAW FIRM, P.C.**
950 W. University Drive, Suite 300
Rochester, MI 48307
Tel: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
wk@millerlawpc.com

Joseph G. Sauder
Matthew D. Schelkopf
Joseph B. Kenney
**SAUDER SCHELKOPF LLC**
555 Lancaster Avenue
Berwyn, PA 19312
Tel: (610) 200-0581
Facsimile: (610) 421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
jbk@sstriallawyers.com

*Attorneys for Plaintiff*